CINCINNATI, N. O. & T. P. RY. CO. et al. v. GRAY.

(Circuit Court of Appeals, Sixth Circuit.  May 8, 1900.)

No. 793.

1. LIMITATIONS—COMMENCEMENT OF ACTION—AMENDMENTS.
   Amendments to a petition against a railroad receiver to recover damages for the death of an employé do not constitute new suits for the purpose of limitations, where the substantive cause of action in both original and amended petitions was the negligence of the receiver.

2. MASTER AND SERVANT—FELLOW SERVANTS.
   The general yard master and a yard foreman in the switch yards of a railroad company are fellow servants.

3. SAME—NEW APPLIANCES—FAILURE TO INSTRUCT SERVANT.
   The receiver of a railroad substituted a new and different switch for one formerly used in a switch yard. The new switch was a reasonably safe appliance, and properly constructed, but it operated in a different manner from the former one, and, under very probable conditions, was dangerous to those using it, and not acquainted with its operation, but no regulations as to its use or other instructions were given the employés in the yard. Within two or three days after the switch was put in a car was derailed in attempting to pass over it, and a yard foreman who was riding thereon was killed, under circumstances clearly indicating that, if he had known the manner in which the switch was operated, the accident would not have occurred. *Held*, that the receiver was liable for having failed in his duty to give proper instructions.

Appeal from the Circuit Court of the United States for the District of Kentucky.

Samuel Thomas, as complainant, instituted a suit in equity in the court below, having for its chief purpose the foreclosure of a mortgage on the Cincinnati, New Orleans & Texas Pacific Railway. Pending the litigation, the appellant S. M. Felton was appointed the receiver of the court in the cause, and was charged with the duty of continuing the operations of the railroad. An

order was entered requiring all persons having claims against the receiver to file them with the master, Richard P. Ernst, Esq., instead of formally suing upon them, and he was directed to report thereon. In pursuance of this requirement the appellee, whose intestate husband was killed while in the service of the receiver, filed a petition before the master, setting up her claim to damages, and no objection was made to this form of proceeding. The petition was several times amended during the progress of the hearings, and again with leave of the court at the trial. The material facts of the case, as we find them from the record, are that the petitioner's intestate, Fletcher B. Gray, was a yard foreman in the service of the receiver, in the extensive yards of the railway company at Somerset, Ky., on Sunday, March 26, 1893; that two or three days before that date the receiver for the first time had placed in the track of the railroad in the yards at that point what is called an "automatic switch," in substitution for one of a different sort, but had made no rules to govern its use, nor had the receiver given any notice of its dangerous character under certain probable conditions, nor any other instructions upon the subject, and it is not shown that Gray knew anything which was not apparent of the nature of the new appliance further than that one Fred. Cook, the general yard master, had informed the employés that the switch worked automatically; that in fact, however, the switch was not intended by the receiver to be left to work itself automatically, but it was intended that it should always be set by hand; that it was in some sense a switch for emergencies, though our view of the precise character of the switch will be stated further along; that the said Cook was general yard master and in complete control of the yards; that upon the date named he got upon an engine, attached to the front of which were two caboose cars, and to the rear another caboose, which was many tons lighter than the engine; that the train thus made up was moved backward, the engine being reversed, thus throwing the single caboose in front of the train as it was moved rapidly south along the main track through the yards; that the engine, in the temporary absence of the regular engineer, was operated by Cook, who, however, was not an experienced engineer; that Gray was on the front caboose of the moving train; that the switch was open; that Gray's attention was called to this fact as the train approached it, but he said it was all right, a remark probably made because he relied upon what Cook, the general yard master, had told the employés, to the effect that the switch worked automatically; that the train, moving at the rate of 18 or 20 miles an hour, went upon the switch; that it was not thrown by the caboose in front, but that the latter mounted the rail, and went off the track upon the right side, while the force and weight of the engine following threw the switch as it went through it, thereby keeping the engine and the other caboose cars upon the track until the engine was thrown off to the left by the front caboose in consequence of its derailment; that there was at the time a box car standing on another and parallel track, and the caboose upon which Gray was riding when it was derailed came in collision with the box car, whereby he was mortally wounded, and soon afterwards died. It is also claimed that the plates upon which the switch was to move, in being opened and closed, were not oiled, but were impeded by the presence of loose cinders or slag, which prevented the prompt closing of the switch. It is shown that this character of switch had been in use upon other railroads for many years; that the one in use here was well constructed and of good quality, and that it had been carefully selected, and was up to the standard of such appliances. It also appears that the railroad track was in good condition at the time. Upon these facts the master reported that the receiver should pay the administratrix of Gray the sum of $8,000 as damages, the circuit court approved this action of the master, judgment was entered accordingly, and, a petition for rehearing having been denied, the case comes here upon appeal from that judgment.

Edward Colston, for appellants.
C. M. Cist, for appellee.

Before LURTON and DAY. Circuit Judges, and EVANS, District Judge.

EVANS, District Judge, after stating the facts as above, delivered the opinion of the court.

Error is assigned by appellant upon the action of the court below in permitting the filing of certain amended petitions, but, as these were matters entirely within the sound discretion of the trial court, the authorities are uniform to the effect that such action is not reviewable upon appeal. This rule applies quite as forcefully to the amended petition permitted to be filed at or near the final hearing of the case as to the others. Corrections and amendments of pleadings are liberally allowed in order to subserve the ends of justice, and to secure a thorough presentation of the claim or defense, so that its merits may be fully disclosed. There was therefore no reviewable error in the action of the circuit court in this respect.

After the judgment in the court below the appellant's counsel presented a petition for a rehearing, which was denied, and error is also assigned upon that action of the court. We need not do more than say that the cases all agree that the action of the trial court, upon petitions of this character and upon motions for new trials, is not assignable for error. They are matters of discretion entirely. It is unnecessary to cite authorities upon this point.

Nor do we think that the Kentucky statute of limitations bars the claim of the petitioner. The claim arose when the injury occurred, on March 26, 1893. The original petition was filed September 18, 1893, much less than the required one year after the injury. The second amended petition was filed on December 26, 1895, a former one not appearing in the record, and the third was, by express leave of the court, filed on April 25, 1899. The last amendment was possibly designed rather to make the pleadings conform to the proof than for any other purpose. It may be, and doubtless is, true that, when an amended petition sets up an entirely new and distinct cause of action, time, under the statute, will not cease to run until the date of filing it. Cecil v. Sowards, 10 Bush, 96; Leatherman v. Times Co., 88 Ky. 292, 11 S. W. 12. But this rule by no means applies to a case such as we have before us, in which the original and real cause of action, namely, the negligence by which Gray was injured, was never departed from nor abandoned. The plaintiff only restated the circumstances of the injury as the investigation appeared to develop them; but these were the particulars, the details merely, of the substantive claim, stated in general terms, that the injury to Gray was due to the inculpating negligence of the receiver.

The action itself, to recover damages for that negligence and its results, was the principal thing, whatever may have been the details incident thereto, and was commenced within one year, and was not barred by the statute of limitations by reason of the supplying, by amendment, of any omission, or by correcting any error in the original statement of the petitioner's claim that her intestate was injured by the receiver's negligence, whether the details of its happening were one way or another. For the injuries complained of the suit was, without any objection to its form, instituted before the master in the way already mentioned, and, although the means and manner of the

infliction of these injuries were variously stated, the appellee, as we have seen, always relied upon the original claim that her intestate was injured by the negligence of the receiver. It does not appear, therefore, that this assignment of error is well taken. The action was brought within the year allowed by the Kentucky statute. It has been prosecuted continuously from that time until now, and the generic cause of action has always been the same.

It was insisted in the circuit court, as it is here, that Cook was not a fellow servant of Gray, but a vice principal, and that his negligence in running the train through the switch when it was open, and his failure to accurately instruct the employés of the receiver as to the limitations upon its use, were not the negligent acts merely of a fellow servant in the same employment with the decedent, but were those of the master himself, in whose employ as vice principal it was claimed Cook in these respects stood. We cannot accept this view, but agree with the learned circuit judge in his opinion that Cook was the fellow servant of Gray, and that no liability arose out of what he did at the time of the accident nor previously in reference to the switch. This conclusion seems unavoidable upon the authority of many cases. Among them we need only cite Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 944; Railroad Co. v. Baugh, 149 U. S. 369, 13 Sup. Ct. 914, 37 L. Ed. 772; Same v. Camp, 31 U. S. App. 236, 13 C. C. A. 233, 65 Fed. 952.

In accepting a voluntary employment, a servant, as is well understood, assumes all the ordinary and obvious risks of such employment, including those arising from the negligence of his fellow servants; but, in the view we take of the facts of this case, our decision must rest upon another phase of it. As we have seen, the form of switch, which is called automatic, while long, successfully, and safely used by other roads, had been in use in the yards of this railroad, when Gray was injured, only two or three days, and it is not shown that he personally had any previous knowledge of the workings or operations of such a switch, particularly in so far as they differed from the old one, which it had replaced. No instructions had been given by the receiver explaining the uses of this new appliance; nor had any notice been given of the possible dangers of its use under certain altogether probable circumstances; nor had any regulations whatever been promulgated respecting its operations, although in some important respects they were very different from those of the old one. True, the switch cannot be regarded as dangerous per se, but certainly there were conditions upon which it might become most dangerous, and these were unknown to Gray. They existed, but he was not notified of it. Though possibly unfortunately called an "automatic switch," it was not intended to do its own work, but was intended always to be set by hand, though its automatic feature was expected to be a useful safeguard in any time of emergency due to a negligent or accidental omission to set it by hand. In this sense, and in this sense only, it was an emergency switch. It is not shown that Gray had notice of these facts. On the contrary, the little information he had about the operations of the switch tended rather to show him that it was a labor-saving device, which was designed to avoid the work of setting it by hand,

and leave it to be operated upon by the force of moving cars and engines as they came upon it, thus doing its own work.

It is true that the general purpose and operations of an ordinary railroad switch were perfectly understood by Gray, and that if there had been nothing more in this case than the act of a fellow servant in running a train through a switch, known and seen to be open, there would not be the slightest right to recover for the injury inflicted in that way. But here there was a new kind of switch, very recently put in. The methods of its operation, particularly wherein they differed from those of the former switch, had not been explained to Gray, and were not obvious. The name "automatic" possibly, and even probably, carried an idea which gave weight to the general yard master's statement to the employés that the new switch would work itself, though, in fact, the receiver never intended that it should be operated in that manner. No notice was given that put the employés generally, or Gray especially, in possession of the fact that the switch, while automatic in name, did not operate, and was not intended to operate, of itself, nor otherwise than in such manner as required it always to be set by hand; nor had there been made or published any general regulations upon the subject for the guidance of the servants who were to use the new switch. It is by no means certain that the name or description of the new switch as "automatic" was not so far misleading and dangerous as to give stress to the necessity for notice and instruction.

Upon the facts shown, we think it is not difficult to deduce from the authorities the rules which fix the duties of the master in cases like this, and determine the tests of his responsibilities to his servants. The considerations which demand that the master shall furnish for his employés reasonably safe appliances for doing the work imposed upon them necessarily reach to and include the requirement that when new, and, so far as they differ and as far as the particular work is concerned, unknown and untried, appliances are substituted for old ones, he shall give full and plain instructions to employés as to the parts of such appliances which are new in operation, in order that a servant may have a fair opportunity, before incurring danger, to understand the difference which might, if unknown, produce it. This obligation on the master is equally as strong when appliances are put in which differ only in some respects from old ones for which they are substituted as it is when there is the beginning of a work or when appliances are more radically or even entirely changed. And, indeed, this duty of the employer is emphasized when ignorance of the points of novelty, either of design or of operation, in the substituted appliance may, as here, involve the most serious consequences affecting the safety and lives of the servants. The obvious fact is that if instruction or notice of the exact situation, in respect to the new switch and its operations, had been given in this case, the accident would not have occurred, at least in the way it did. This illustrates the extreme importance of the duty of the master in regard to making known the difference between the workings of the new and the old machinery, especially where that difference is the one which, if unknown, might bring about dangerous conditions or consequences. The servant in such cases is entitled to

notice and information upon these points, and it is the duty of the master to give it. His failure to do so is negligence. In the case before us there was negligence in this respect, and we do not doubt that it was the proximate cause of the injury to Gray.

In speaking of the general rule that the master is exempt from liability to one servant for injuries caused by the negligence of a fellow servant in the same employment, and of certain exceptions thereto, the supreme court, in the case of Hough v. Railroad Co., 100 U. S. 217, 25 L. Ed. 615, said:

"One, and perhaps the most important, of those exceptions arises from the obligation of the master, whether a natural person or a corporate body, not to expose the servant, when, conducting the master's business, to perils or hazards against which he may be guarded by proper diligence upon the part of the master. To that end the master is bound to observe all the care which prudence and the exigencies of the situation require in providing the servant with machinery or other instrumentalities adequately safe for use by the latter. It is implied in the contract between the parties that the servant risks the dangers which ordinarily attend or are incident to the business in which he voluntarily engages for compensation, among which is the carelessness of those, at least, in the same work or employment, with whose habits, conduct, and capacity he has, in the course of his duties, an opportunity to become acquainted, and against whose neglect or incompetency he may himself take such precautions as his inclination or judgment may suggest. But it is equally implied in the same contract that the master shall supply the physical means and agencies for the conduct of his business. It is also implied, and public policy requires, that in selecting such means he shall not be wanting in proper care. His negligence in that regard is not a hazard usually or necessarily attendant upon the business. Nor is it one which the servant, in legal contemplation, is presumed to risk; for the obvious reason that the servant who is to use the instrumentalities provided by the master has, ordinarily, no connection with their purchase in the first instance, or with their preservation or maintenance in suitable condition after they have been supplied by the master."

In the case of Mather v. Rillston, 156 U. S. 399, 15 Sup. Ct. 467, 39 L. Ed. 470, where the circumstances were such as to call for strong and emphatic language, the court said:

"Indeed, we think it may be laid down as a legal principle that in all occupations which are attended with great and unusual danger there must be used all appliances, readily attainable, known to science for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence. If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of. So, too, if persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of laborers thereon, and such laborers remain in ignorance of the dangers and suffer in consequence, the employers will also be chargeable for the injuries sustained. Both of these positions should be borne constantly in mind by those who engage laborers or agents in dangerous occupations, and by the laborers themselves as reminders of the duty owing to them. These two conditions of liability of parties employing laborers in hazardous occupations are of the highest  portance, and should be in all cases strictly enforced. Further than this, it is plain from what has already been stated that the plaintiff knew nothing of the special dangers attending his work, or that he was at all informed by the defendants on the subject. His testimony is positive on this point, and is not contradicted by any one. With that fact shown, there was no ground for any charge of contributory negligence on his part."

While the facts of that case were quite different from those in the case before us, the general principles announced as to the duty of the master may well find application here to the extent, at least, that such application is called for. It may be that the principles enforced there would create a rule of liability beyond that demanded in this case, and they might establish a test of duty for the master much more exacting than is required in the operations of a railroad where the dangers to experienced employés are much less than those shown under the facts in that case. Still those principles do, in their scope, embrace cases like the present, where the master so certainly failed in the discharge of his duty in the respect already indicated.

In the case of Railroad Co. v. Herbert, 116 U. S., at page 648, 6 Sup. Ct. 593, 29 L. Ed. 758, in speaking of the correlative duties and rights of master and servant in regard to machinery, appliances, etc., the supreme court in one sentence epitomizes a phase of the subject in this language: "His [the servant's] contract implies that in regard to these matters his employer will make adequate provision that no danger shall ensue to him." Doubtless the dangers alluded to were unnecessary or unknown dangers, but this statement from the court's opinion gives a clear idea of the master's duty in the case before us. The master should have taken adequate measures to make known the dangers which persons ignorant of the workings of the new switch might incur by its use.

Many other cases from the supreme court might be referred to illustrative of the general principles we are discussing, but we will only name that of Railway Co. v. Archibald, 170 U. S. 669, 18 Sup. Ct. 777, 42 L. Ed. 1188, and that of Railway Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787, where, on page 382, 112 U. S., page 186, 5 Sup. Ct., and page 790, 28 L. Ed., the court, after alluding to the arguments by which the doctrine that the servant assumes the known and ordinary risks of his employment are supported, said:

"But, however this may be, it is indispensable to the employer's exemption from liability to his servant for the consequences of risks thus incurred that he should himself be free from negligence. He must furnish the servant the means and appliances which the service requires for its efficient and safe performance, unless otherwise stipulated; and if he fail in that respect, and an injury result, he is as liable to the servant as he would be to a stranger. In other words, while claiming such exemption, he must not himself be guilty of contributory negligence."

In 1 Shear. & R. Neg. (5th Ed.) § 202, the authors say:

"A master who employs servants in a dangerous and complicated business is personally bound to prescribe rules sufficient for its orderly and safe management, and to keep his servants informed of these rules, so far as may be needful for their guidance."

And they amplify the principles applicable to this case in section 203 in the following language:

"It is also the personal duty of the master, so far as he can, by the use of ordinary care, to avoid exposing his servants to extraordinary risks which they could not reasonably anticipate, although he is not bound to guaranty them against such risks, nor to guard against an accident which is not at all likely to happen. The master must therefore give warning to his servants of

all perils to which they will be exposed, of which he is or ought to be aware, other than such as they should, in the exercise of ordinary care, have foreseen as necessarily incidental to the business in the matter and ordinary course of affairs, though more than this is not required of him. It makes no difference what is the nature of the peculiar peril, or whether it is or is not beyond the master's control. And it is not enough for the master to use care and pains to give such notice. He must see that it is actually given. If, therefore, he fails to give such warning, in terms sufficiently clear to call the attention of his servants to a peril of which he is or ought to be aware, he is liable to them for any injury which they suffer thereby without contributory negligence. Such notice must be timely; that is, given in sufficient time to enable the servant to profit by it. It is therefore the duty of the master to give adequate and timely warnings of changes in the situation involving new dangers."

The last proposition announced in the paragraph just quoted is supported by several cases, such as Railroad Co. v. Kerr, 148 Ill. 605, 35 N. E. 1117; Donahoe v. Railroad Co., 153 Mass. 356, 26 N. E. 868; Stephenson v. Ravenscroft, 25 Neb. 678, 41 N. W. 652; Milling Co. v. Sharp, 5 Colo. App. 321, 38 Pac. 850. Elliott, in his work on Railroads (volume 3, §§ 1268, 1272, 1273), lays down the recognized general propositions in regard to the duty of the master to furnish safe appliances and safe places for the servant to work in, but we do not deem it necessary to cite other authorities.

We conclude that while the railroad track in the yard at Somerset, and even the new switch itself, were in good physical condition, and while it is shown that the receiver used at least ordinary care to have them so, still that the existence of the latent dangers connected with the operation, by ignorant persons, of the new form of switch just put in, must have been known to the receiver, and that such information must have been acquired by him, when he was purchasing the switch and preparing to put it in use in the yard. At all events, that he must be charged with having such information we cannot doubt. If this is true, it follows that it was his duty to give notice of those dangers to Gray by explanation in some form, or by rules or regulations brought to his attention. There does not seem to have been anything of this kind done. If notice in any form of the exact facts had come to Gray before he went upon the train, his going would then have been at his own risk, and his not signaling the engineer to stop the train when he saw that the switch was open would then have been his own folly. Not to have endeavored to stop the train under such circumstances, and if he had known of the danger arising from the switch being open, would have been suicidal; but not to have made an effort to have the engineer stop, under the actual facts as disclosed by the evidence, shows the utter ignorance of Gray of the danger about which the master should have seen that he was accurately informed.

The general and correct propositions of law that an employer does not insure the safety of his employé; that if the latter knows of risks, and voluntarily subjects himself to them, the master is not liable for the injury thereby incurred; and that, generally, all that is required of the master is to provide reasonably safe appliances for the use of his employés in their work, and reasonably safe places for them to work in,—are in no wise questioned. The sole ground upon which we rest our judgment upon this case is that there was a latent and unapparent, but a very certain and material, danger to uninformed employés, ac-

customed to operating the other form of switch, in the use, without sufficient knowledge, of the new so-called "automatic switch," under the circumstances of this case, of which danger it was the duty of the receiver, who must have known of it, to give, in some way, clear and unmistakable information to his employés, including Gray. The failure of the receiver to do this by regulation, rule, notice, or otherwise was such negligence upon his part as renders him liable for the injuries to Gray, who was evidently subjected to a great risk and hazard, the existence of which he did not suspect, but which could have been obviated very easily by notice to him from the better-informed receiver. It results that the judgment of the circuit court must be affirmed.

On Petition for Rehearing.

(June 11, 1900.)

In an elaborate petition the court has been asked by the appellant to rehear this case, mainly upon the ground that the statute of limitations barred the remedy of the appellee. In support of this contention he relies chiefly upon the opinion of the supreme court in the case of Railway Co. v. Wyler, 158 U. S. 285, 15 Sup. Ct. 877, 39 L. Ed. 983. This question had already received the careful consideration of the court, and there is nothing in the opinion referred to which makes it necessary for us to change our judgment. In that action against the railway company for damages, the plaintiff based his claim upon the general law of master and servant and his rights thereunder. During the progress of the suit an amended petition was filed, by which a cause of action was set up growing out of the same facts, but based upon the rights and liabilities created and existing under a statute of the state of Kansas. The statute which supported the claim made in the amended petition had created a cause of action entirely different from the one arising at common law, set up on the original petition. The court, upon that ground alone, held that there was a departure, and that the plea of the statute of limitations would therefore prevent the relief sought by the amended petition. To the case before us that ruling cannot apply, because, if for no other reason, there was no departure. The principle upon which this case must turn is very different. In Railroad Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, 36 L. Ed. 829, the original petition claimed, as appears from the record, that the injury resulted "because of the defective condition of the cross-ties and of the roadbed, through the negligence of the receivers." In the amended petition it was averred that "Cox, in coupling the cars, as it was his duty to do, was injured on account of the drawhead and coupling pin not being suitable for the purposes for which they were to be used, he being ignorant thereof, and of the defective condition of the track." The statute of limitations being pleaded to the amendment, the court adjudged that it did not apply. The facts in the case before us do not seem to differ in any material respect from those in the Case of Cox, just referred to, so far as our decision must depend upon them. Here, as in the Cox Case, the original petition specified certain acts of negligence. The amended petition specified certain others

which contributed to or concurred in producing the one injury complained of, namely, the death of Gray.

The Kentucky practice is quite as instructive and controlling. In Greer v. Railroad Co., 94 Ky. 169, 21 S. W. 649, the only negligence alleged in the original petition related to the act of driving or operating the train. An amended petition was tendered, setting up as additional acts of negligence that the guard rail and coupling pin were defective. The inferior court refused to permit the filing of this amendment, which action of the court, under the Kentucky practice, was reviewable. The court of appeals held that it was error to refuse permission to file the amendment, upon the ground that the proposed amendment was not a departure, inasmuch as the cause of action was not changed, and as the alleged acts of negligence may all have concurred to cause the injury.

In Smith v. Railway Co., 5 C. C. A. 557, 56 Fed. 458, it was held by the circuit court of appeals of the Eighth circuit that:

"Where, in an action against a railroad company for causing the death of an employé, the original petition proceeds entirely on the ground of the company's negligence in employing an engineer of known incompetence, an amendment which alleges that the engineer was negligent, and that he and the deceased were not fellow servants, does not introduce a new cause of action, but is only an amplification of the original one, and is a proper amendment."

The circuit court of appeals for the Fifth circuit, in Cross v. Evans, 29 C. C. A. 523, 86 Fed. 6, distinctly held that the assignment of additional specifications of negligence in an amended petition does not create a new cause of action, so as to let in the plea of limitations. Under section 134 of the Kentucky Civil Code of Practice amendments are most liberally allowed to promote the ends of justice, and we adhere to the view, already expressed, that the amended petitions filed in the case were but amplifications of the one cause of action.

It is not necessary to notice specifically the other grounds upon which the rehearing is asked. The petition is dismissed.