MERCANTILE TRUST CO. v. PITTSBURGH & W. RY. CO. (LAKE, Intervener).

(Circuit Court of Appeals, Third Circuit. April 25, 1902.)

No. 2.

1. EQUITY—PETITION AGAINST RECEIVER FOR TORT—PLEADING.
    Proceedings on a petition of intervention filed in a suit in equity against a receiver therein, asserting a claim for damages for the death of an employé, alleged to have resulted from negligence in the operation and management of a railroad by the receiver, are equitable in character, and the petitioner is entitled to have the receiver plead in conformity to the rules and practice in equity.

2. MASTER AND SERVANT—DUTY TO WARN SERVANT OF SPECIAL RISKS.
    The duty of informing a servant of special or extraordinary risks connected with his service is a primary duty of the master, when they are known to him and the delegation of such duty to any other servant, whether higher or lower in the scale of employment than the one exposed to the peril, cannot relieve him of the responsibility imposed on him by the law.

3. SAME—STORM CAUSING DAMAGE TO RAILROAD TRACK—FAILURE TO WARN TRAINMEN.
    A brakeman on the second section of a fast freight train on a railroad operated by a receiver was killed in a wreck at night, caused by a landslide. There had been heavy rains during the day along that portion of the road, and a storm in the evening, of unusual, if not unprecedented, violence, causing a number of landslides and washouts, which were known to the train dispatcher; and he notified the conductor and engineer of the first section of the train, on leaving the last station, to look out for slides at various places specified, but which did not include the place where the wreck subsequently occurred. Those in charge of the second section, which left 20 minutes later, received no notice or warning at all. Held, that the failure to give such notice

of the general dangerous condition of the track was culpable negligence, which was a proximate cause of the accident, and rendered the receiver liable for the death.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

Charles Koonce, Jr., and James H. Wilson, for appellant.
John McCleave, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. On the 18th day of March, 1899, Mattie Lake, by leave of the court, filed her intervening petition in the case of the Mercantile Trust Company v. the Pittsburgh & Western Railway Company, then pending in the circuit court of the United States for the Western district of Pennsylvania, in equity. In her petition, she claims in behalf of herself and infant son, damages from the receiver of said railway company for the death of her husband, which she alleges was occasioned by the negligence of said receiver in operating said railway.

The decedent, John R. Lake, was, on the 22d day of March, 1898, and for some time prior thereto had been, in the employ of the respondent, as a freight brakeman. On the day mentioned, Lake and his fellow members of the crew of trainmen, at De Forrest Junction (a station on respondent's road about 12 or 14 miles north of Youngstown, Ohio), took charge of a through fast freight train running between Chicago and the East, for the purpose of running it to Bennett (a station on respondent's road near the city of Pittsburgh, Pa.). Between these points, near Carbon station, on the road which respondent was operating as receiver, the main track ran along the southern base of a range of hills which are parallel with said track, and at the point referred to, said track cuts the base thereof so as to form an embankment on the north side of said track about 12 feet high. From said railroad, the hills retreat northward at a steep degree of inclination. On the hillside facing the track are gullies and ravines, which drain about 75 acres. Through the center of it runs a slight embankment, built to support a tramway to the top of the hill, where was an abandoned limestone quarry. This embankment, on one side thereof, deflected the direction of the waters draining the hillside, and on the night of the accident, helped to cause such a concentration of water as made a washout and carried clay and gravel over the tracks of respondent's railroad. The accident, in which decedent lost his life, was caused by this obstruction. One of the allegations of intervener's petition is, that respondent was guilty of negligence, in not appreciating the danger of a washout at the place in question, and in not guarding against it, it being charged that the ditch to carry the water off which came down the hillside, was insufficient, and the culvert through which it was discharged, was much too small.

On the 22d of March, it had rained a great portion of the day, and in the evening there occurred a very heavy rain storm, washing away bridges and causing landslides to occur on respondent's tracks, which interrupted traffic over his road from a station about 8 miles south

of Youngstown to Pittsburgh, which included the place of the accident. Between these places are Hazelton and New Castle Junction, about 15 or 16 miles apart, and between them, some 5 or 6 miles east of Hazelton, is Carbon station, near which the accident took place. The chief dispatcher on the day in question was at New Castle Junction. Fast freight train No. 94, coming from the west, was run in two sections, the first section arriving at Hazelton in time to leave there at 8:02, the second section 20 minutes later. The rain of all day and heavy storm of the evening had by that time worked great havoc along the line of the road east and west of New Castle Junction. All admit that it was a heavy rain in the evening, and respondent's witnesses declare that it was a storm of unusual violence. The master reports that there was evidence to show that the amount of rain falling throughout that section of the country, including the place of the accident, was very great, if not unprecedented.

The chief dispatcher at New Castle Junction had learned by 7:30 o'clock that at many places between Lowellville and Allegheny City, including points between Hazelton and New Castle Junction, the tracks had been obstructed by washouts, and that a bridge over Herron's creek was washed out by the flow, thus cutting the main line of the road, and making a detour by a branch road necessary for all trains. The master also reports that there was evidence by the witnesses called in behalf of the petitioner, that there had been obstructions, caused by rain storms, on the track at the place of the accident, at times prior to the date thereof, but that this was denied by the witnesses called in behalf of the respondent. With this knowledge of the serious character of the storm possessed by the dispatcher at New Castle Junction, no notice was given to section 2, although a notice was communicated to the conductor and engineer of the first section, to proceed with caution and look out for washouts and landslides at certain named points. Section No. 1, leaving at 8:02, passed the point of danger safely, but section No. 2, leaving Hazelton 20 minutes later, proceeded at its usual speed, until it reached the obstruction at a point a little distance west of Carbon station. The engine and several cars were thrown from the track, and the petitioner's husband so injured that he died before he was taken from the wreck.

On this general statement of facts, the petitioner complains of negligence on the part of the respondent on three distinct grounds, which are briefly stated as follows:

(1) Ordering the train on which decedent was, to leave Hazelton for New Castle Junction—a distance of 16 miles—without in any manner notifying him, or those in charge of the train, of the dangerous conditions prevailing along the road at that time.

(2) Inadequate provisions for the carrying away of surface water accumulating at the place of the accident.

(3) Failure and omission to furnish sufficient employés to inspect and watch the condition of the track and roadbed at the place of the accident, under the circumstances in this case.

No answer or other pleading was filed to the intervener's petition, and no appearance having been entered by respondent, the intervener, on the 17th of November, 1899,—nearly nine months after the filing

of her petition, asked that her petition be taken pro confesso. The court overruled this motion, and ordered respondent to file his answer to the intervener's petition "instanter." At the same time, the intervener moved the court to order the issues of the case to be tried by a jury. This the court declined to do, and ordered that the case be referred to a special master. On the 30th of January, 1900, the parties appeared before a special master, in pursuance of said order, and respondent, by his counsel, offered to file a plea of "not guilty," to which objection was made for the reason that it was not a pleading in accordance with the practice of the federal courts, in a case of this character, which was equitable in its form and character, and should be governed by the rules and practice in equity.

The special master did not pass upon this objection or admit the pleading, at that or any other time during the hearing before him. It was filed, however, on the 7th of April, 1900. At the commencement and close of respondent's testimony, an objection was made by the intervener to the introduction of any evidence on the part of the respondent, for the reason that no issue was made to which evidence could be adduced by him. This objection was overruled de bene esse, but neither the master nor the court below, at any time thereafter, passed upon these questions, although they were raised by the intervener in her exceptions to the master's report. Notwithstanding this imperfect state of the pleadings, the master proceeded to hear the case, and on the 7th of April, made his report, in which, after sundry findings of fact and conclusions of law, he recommended that the intervener's petition be dismissed. To this report, exceptions were filed by the intervener, and argued by counsel to the court below. On the 24th of November, 1900, a decree was entered by the court below, in favor of the respondent and dismissing the petition of the intervener.

Upon this statement of the proceedings had subsequent to the filing of her petition, the intervener, in addition to the grounds of recovery urged in her petition, makes the point "that a plea of 'not guilty' is not a sufficient answer in an equity case, to raise issues entitling the respondent to adduce evidence contradictory to that of complainant, except as to the amount of damages, where damages are claimed."

It is clear that the proceeding instituted by the intervener's petition was one in equity. It was addressed to the equity side of the court, in an equity suit there pending. The receiver of the railroad company, as the officer and hand of the court, had control and management of the said railroad, and possession of all its funds and assets. The intervener sought by her petition for an order upon the receiver, that he should recognize and pay out of these funds a claim for unliquidated damages, accruing on an alleged liability incurred by the said receiver in the operation and management of the road. Under the circumstances, we think the case was one of equitable cognizance, and should have been proceeded with in accordance with equity rules and practice, and that the petitioner was entitled that the respondent should either demur to the complaint of her petition, or should file an answer thereto, admitting or traversing every material allegation of the petition, and stating with sufficient particularity every

substantive defense.  The plea of "not guilty," while appropriate to a trial at law, we think was inadmissible in the proceedings below. The plea was a nullity.  No proper issue was raised thereby.  We cannot say that she was not injured by the want of an answer—specific answer—to the averments of her complaint.  She was denied that which was the right of every complainant in a court of equity.

But though of opinion that the proceedings below in this respect were grossly irregular, we place our determination of the case upon its merits, and therefore turn to what seems to us the most serious charge of negligence made by the intervener.  This is, that under the conditions which obtained along the respondent's tracks, on the night of the accident, it was his duty to give intervener's decedent, or those in charge of his train, notice thereof, and that his failure so to do was the proximate cause of the accident.  It was undoubtedly the duty of the receiver to notify his employés of any unusual danger to which they might be exposed in the performance of the service in which they were engaged, of which he was informed and they were not, or of which the master was better informed than the servant could be.  To give such notice to the employé, is the exercise of that proper and reasonable care for the safety of the servant, which the law imposes as a duty upon the master.

Recurring to the facts disclosed by a careful reading of the record, and as found by the master:  It appears that it had been raining all through the day of March 22d, and that at its close a storm of unprecedented violence set in throughout the region in which that part of the railroad of respondent, with which we are here concerned, was operated.  The chief dispatcher at New Castle Junction, 16 miles east of Hazelton, had full information as to the character of the storm and the havoc it was creating on certain portions of the road, at 7:45 on the evening of the accident.  At that time, he sent a dispatch to Hazelton, which in substance annulled train No. 5, being the Chicago Express, going west, which would have occupied the road between Hazelton and New Castle Junction about that time.  This order was communicated to those in control of the first section of No. 94 fast freight.  A notice was also given to the conductor and engineer of said first section, to run cautiously and look out for washouts at certain specified places between Hazelton and New Castle Junction.  It is true that this notice did not include the point near Carbon station, at which the accident afterward happened.  Section No. 1, as we have seen, left Hazelton at 8:02 in the evening, passed the point of the accident, some five or six miles west of Hazelton, in safety, and arrived at New Castle Junction at 8:45.  Section No. 2 of the same train, and upon which was decedent, left Hazelton at 8:22, having received the notice that the Chicago Express had been annulled and that it had a clear track before it to New Castle Junction.  As this was a fast freight, this notification gave it the right of way, and must necessarily have had the effect of measurably relieving the mind of the engineer from anxiety as to the speed of his train. There was no notice, however, given to the conductor or engineer, or any other person on the train, such as was given to those on the first section, warning them of possible dangers along the road result-

ing from the storm then raging. As to this important fact, the finding of the master is as follows:

"It further appears that on the evening of the accident the conductor and engineer of the first section, as was the custom in such cases, had received notice to look out for slides on account of the amount of rain that had fallen at various places specified in the notice, to wit, at Himrod, at Struthers and at Sand Cut, but said notice did not specifically warn these employés on the first section to look out for obstructions at the place where the accident subsequently occurred. The conductor and engineer of the second section received no such notice, nor any notice at all."

It is urged by respondent, and his argument is accepted by the master, that as the notice given to the first section was to look out for washouts or dangers at certain specified points, and as these did not include the place of the accident, therefore, such a notice to the second section would have been unavailing to prevent the accident that afterwards occurred. It would seem obvious, however, that any notice of special dangers, such as that given to the first section, would have served as a caution to those in control of the train, and so impressed upon them the necessity of careful running of the train, as would have prevented the accident that actually occurred. The argument of respondent and the view taken by the master overlook the fact, that the charge of negligence here is, not that the precise notice given to section No. 1 was not given to section No. 2, but, that no notice of any kind calculated to warn or caution those in control of section No. 2 of special dangers resulting from the storm, was given to them. Under the circumstances, the neglect to give such warning was a culpable breach of the duty owed by the respondent to his servants engaged in running section No. 2. As we have already said, the storm was of unusual and extraordinary, if not unprecedented, violence, and that it had already wrought havoc and obstruction along the line of the road to be traversed by decedent, was known by those to whom the duty of watching and observing such conditions, and of caring for the safety of those exposed to their special dangers, was delegated. No valid excuse is interposed by respondent for the nonperformance of this duty. No custom dispensing with such a notice, or practice of omitting it, as to which its employés were informed, was attempted to be proved. On the contrary, the testimony of the respondent's dispatcher was to the effect that it was always expected that warning should be given in case of storms, even of those much less violent than that of the night in question. Besides, that there was necessity on this occasion for such a notice, even in the opinion of those in charge of the railroad, is evidenced by the fact that special warning was given to section No. 1, and that the chief dispatcher testified that he thought and believed that he had sent a notice to those in control of section No. 2.

It is intimated that as the engineer and conductor, and those on board the trains, were exposed to the storm, they knew of its violence and were thereby warned of its dangers. But this is not true, in the sense in which it must be true to relieve the respondent from liability; that is, in the sense that the peril was an obvious one, and those exposed to it were bound to observe it and guard themselves against it. The violence of the storm immediately around themselves,

did not necessarily give those on the train the information as to the results of that storm along the line of the railroad, which was possessed by the dispatcher who was in telegraphic communication with the whole line. It was the fact that the storm had produced and was producing landslides and washouts at various points, that constituted the ground for apprehension, and created the necessity for extraordinary care and caution. That the storm was of this character, could not be known by those in control of section 2, unless the information was conveyed to them by those who had received the telegraphic reports concerning the same. This, then, was not the case of a servant assuming the risk of a known and obvious peril.

We are compelled to the conclusion, therefore, that the neglect to give those in control of section No. 2 any notice whatever, which would serve to caution them against the results of this extraordinary storm, was a proximate cause of the accident, by which decedent came to his death, and was culpable negligence for which the respondent is liable. Such conclusion is strengthened by the fact which appears in the record, that after the first section had left Hazelton, but before the second section had left, the dispatcher was in possession of additional information as to the severity of the storm and the havoc caused by it. This fact serves to increase the burden of responsibility resting upon the respondent, with respect to notifying those on section No. 2 of the general dangerous condition of the road.

The duty of informing a servant of special or extraordinary risks connected with his service, is a primary duty of the master, and the delegation thereof to any inferior servant, cannot relieve him of the responsibility imposed upon him by law. Whether the servant, to whom such duty is delegated, be higher or lower in the scale of employment, makes no difference. By whomsoever performed, the duty is that of the master, and he is always responsible to the servant for its due performance.

This view of the case makes it unnecessary that we should consider the other charges of negligence contained in the petition, although one of them, touching the inadequate provision for carrying away the water accumulating from the hillside at the place of the accident, impresses us with its importance.

The decree of the court below is therefore reversed, with directions to the said court to enter a decree in favor of the petitioner, and to assess her damages by reason of the premises by such mode as it shall determine.