### CHICAGO, M. & ST. P. RY. CO. v. RILEY.

(Circuit Court of Appeals, Seventh Circuit. April 10, 1906.)

#### No. 1,223.

1. MASTER AND SERVANT—INJURIES TO SERVANT—RAILROADS—APPLIANCES—ENGINEERING SCHEME.

The location of a switch stand in a railroad yard by a railroad company between two tracks, so close to one of them that the switch handle would strike the steps of passenger cars on another track, was a part of an engineering scheme in the construction of the railroad, and, in the absence

of manifest errors in construction patent to an ordinary observer; did not involve a question of negligence, to be passed on by a jury in an action for injuries to a switchman while using the switch.

[Ed. Note.—Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

**2. SAME—SAFE PLACE OF WORK—ASSUMED RISK.**

A switchman in the employ of a railroad company was entitled to assume that the latter would use due care to furnish him with a reasonably safe place in which to do his work and to furnish suitable appliances in the operation of the business, and did not therefore assume the risk of the railroad company's negligence in performing such duties.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 547–555.

Assumpsit of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

**3. KNOWLEDGE OF DEFECTS—FAILURE TO WARN.**

Where defendant railroad company located a switch stand as a part of its prearranged plans for the construction of its yards in such a position between two track leads that under certain conditions likely to arise the handle of the switch would come in contact with the steps of passenger cars passing the stand, but such danger was neither obvious nor known to plaintiff, a switchman, who was injured by having his hand crushed between the switch handle and a car step, defendant was guilty of negligence in failing to warn plaintiff of the danger.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 315–316½.]

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

The defendant in error brings this suit to recover damages for personal injuries received on or about June 1, 1904. Riley had been in the service of the Chicago, Milwaukee & St. Paul Railway Company about nine years at different places in its Western avenue switch yards, and for two months he had been foreman or conductor in charge of the switch crew, operating, among other switches, switch known as No. 3, by means of which he alleges the accident occurred. He worked from 7 in the morning until 6 o'clock in the evening, and in the discharge of his duties threw said switch very frequently. The switch stand was of the kind known as a "ground switch." Immediately preceding the accident, the handle or arm depended from the stand on the east side thereof, and hung practically perpendicularly, resting in a slot, and hugging the switch stand. To throw the switch, defendant in error stood on the east side of the switch stand, reached down and seized the handle, raised it until it stood at a right angle to the switch stand, and then pushed it horizontally towards the north, 90 degrees. When the desired switch connection is made, the handle, released from the grasp of the operator's hand, drops again into a perpendicular position at that place, and is thereby set. The switch stand is one of a series of seven stands controlling several lead tracks. The switch stands were situated between two tracks, one known as the "rip lead track" on the south, upon which, with its connecting side tracks, defendant in error was employed as foreman of a switching crew engaged in sorting and distributing freight cars to the different side tracks, and the other or northern track known as the "passenger yard lead," over which passenger trains were moved to and from the storage yard lying to the west. The switch stands were used in connection with the rip lead track and its branches, and in the sorting of said cars, defendant in error had occasion to throw some one of said switches as often as one in each 10 minutes during the day. The distance between the passenger lead and the rip lead at switch No. 1 was 7 feet 10¾ inches; at switch 2, 7 feet 8 inches; at No. 3 (here involved), 7 feet 9 inches; and at No. 4, 8 feet 4¾ inches. At the other three switches the distance was much greater, owing to the curving of the track. The center of switch stand No. 1 was 4 feet 3 inches from the nearest rail of the passenger

lead, and 3 feet 8¾ inches from the nearest rip lead rail. The center of switch stand No. 2 was 3 feet 1 inch from the nearest rip lead rail, and 4 feet 7 inches from that of the passenger lead. The center of switch stand No. 3 was 3 feet 9 inches from the nearest rail of the passenger lead, and 4 feet from the rip lead rail. The center of switch stand No. 4 was 4 feet 7½ inches from the nearest passenger lead rail, and 3 feet 9¼ inches from the rip lead rail. The switch handle extended 21 inches from the center of the stand, and when raised was 14 inches above the base of the stand. This switching device had been in operation at that point for more than eight years, and no accident had theretofore occurred from its use. On the day in question, the switch engine under the charge of defendant in error and one car were upon the rip lead track at switch stand No. 1, about 30 or 40 yards distant from stand No. 3, moving to the west and toward switch stand No. 3. At the same time the coaches of the Elgin accommodation train were being backed westward and toward switch stand No. 3 on the passenger lead track. Defendant in error was desirous of setting the one car from the rip track onto side track 3. Standing on the east side of switch stand 3, he raised the switch handle, which was 1½ or 2 inches in diameter, until perpendicular to the switch stand, taking hold of the end of it with his thumb and forefinger so that they extended beyond the end of the handle half a finger's length or width (plaintiff uses both terms). By the time he had moved the handle 90 degrees, or until it extended directly to the north, the Elgin train had backed up, and was passing from behind him to the westward, opposite the end of the extended switch handle. In some way, as he says, his hand was caught between the handle and one of the car steps of the Elgin train. The back of his hand, his forefinger, and his second finger were crushed. The thumb was not injured. He knew that the passenger train was approaching, but did not, he says, know that it would come near enough to the handle end to strike it or touch his hand. There is no evidence tending to show that plaintiff in error or any of its servants knew from observation that the handle and steps of any of the cars would collide in passing. Some of the witnesses who had operated the switch had observed that the steps came very close to the handle, and had been careful to throw the switch handle, which was the act of a moment, while the body of the car between the steps was passing, to avoid the steps. Trains were passing on the passenger lead at short intervals all day long. There was a slight northward curve in the passenger lead at or near switch stand No. 3. Assuming this to be so, defendant in error says there would be a lateral swaying or side motion, tending to throw the end of the car nearer the switch. The car which caused the accident cannot be identified. After the accident, the yardmaster of plaintiff in error, Costello, caused three passenger coaches to be pulled to the switch stand in suit and stopped. The steps of the second car from the engine, when thus standing, would not clear the handle. The first car did clear. The cars used varied considerably in width, the latest patterns being the widest. By stipulation of the parties, four photographic views of the tracks and switch stands in the immediate vicinity of switch stand 3 were introduced, and are part of the record on review. In his declaration defendant in error plaintiff below, charged negligence on the part of the plaintiff in error in placing and maintaining the switch, and in failing to give notice to him that the same was too close to the passenger lead. No question is raised as to the pleadings. At the close of the evidence, plaintiff in error requested the court to direct a verdict for the defendant, which request the court refused, and exceptions were taken, which are now before this court, numbered 1 to 4, inclusive. Other exceptions were taken to the ruling of the trial court in giving and refusing instructions. Exceptions 14, 15, and 16 refer to the admission of certain evidence. There was a verdict and judgment for the plaintiff below, and the case is brought here for review.

Chas. B. Keeler, for plaintiff in error.

James C. McShane, for defendant in error.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge, after stating the facts, delivered the opinion of the court.

It is contended by plaintiff in error that the location and maintenance of switch stand No. 3 was an engineering problem, and that therefore the question as to whether plaintiff in error was negligent in that respect should not have been submitted to the jury.

It appears that the accident occurred in what are known as the "Western Avenue Yards" of the plaintiff in error; that these yards consist of a network of tracks, switches, and other appurtenances to railroad yards. It is manifest that, in order to secure the best results, there must be as great economy of space as is consistent with a reasonable regard to the convenience of business, such as the handling and storing of cars and locomotives, as well as to the reasonable safety of the employés. It cannot be said that a railroad company is required to arrange its tracks and yards mainly with a view to protect its employés. The object of railroad yards is to transact the business of the company. Employés should knowingly be subjected to no greater hazards, however, than are reasonably essential to the reasonable use of the yards. It is a matter of common knowledge that these places are very dangerous, and require the exercise of great caution on the part of those there employed. Defendant in error undertook and assumed all such hazards as were reasonably incident to his work. This doctrine is well stated in Randall v. B. & O. R. Co., 109 U. S. 478, 3 Sup. Ct. 322, 27 L. Ed. 1003. The court says:

"A railroad yard, where trains are made up, necessarily has a great number of tracks and switches close to one another, and any one who enters the service of a railroad corporation, in any work connected with the making up or moving of trains, assumes the risk of that condition of things."

Was the location and maintenance of the switch in question an engineering problem—one which was arrived at as the result of engineering skill? In the case of Tuttle v. D., G. H. & M. Ry. Co., 122 U. S. 194, 7 Sup. Ct. 1168, 30 L. Ed. 1114, the court uses this language:

"We have carefully read the evidence presented by the bill of exceptions, and, although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less that it should be left to the varying and uncertain opinions of juries to determine such an engineering question. For analogous cases as to the rights of a manufacturer to choose the kind of machinery he will use in his business, see Richards v. Rough, 53 Mich. 212, 18 N. W. 785; Hayden v. Smithville Man. Co.; 29 Conn. 548, 558. The interest of railroad companies themselves is so strongly in favor of easy curves as a means of facilitating the movement of their cars that it may well be left to the discretion of their officers and engineers in what manner to construct them for the proper transaction of their business in yards, etc. It must be a very extraordinary case, indeed, in which their discretion in this matter should be interfered with in determining their obligations to their employés. The brakemen and others employed to work in such situations must decide for themselves whether they will encounter the hazards incidental thereto; and, if they decide to do so, they must be content to assume the risks. For the views of this court in a cognate matter, see Randall v. Baltimore & Ohio Railroad, 109 U. S. 478, 482, 3 Sup. Ct. 322, 27 L. Ed. 1003."

The same doctrine was laid down in regard to a guard rail and blocking by the Court of Appeals for the Eighth Circuit in Morris v. D., S. S. & A. Ry. Co., 108 Fed. 748, 47 C. C. A. 661, and by the same court in regard to an unblocked frog in Gilbert v. B., C. R. & N. Ry. Co., 128 Fed. 531, 63 C. C. A. 27. Also by the Supreme Court of Illinois with regard to a butting post at the end of a stub track in Railroad Co. v. Driscoll, 176 Ill. 334, 52 N. E. 921. Also by the Appellate Court of Illinois with reference to the close proximity to each other of two side tracks in Railroad Co. v. Healy, 109 Ill. App. 531, and in St. Louis, etc., Yards v. Burns, 97 Ill. App. 178. And by the same court with reference to the manner in which handholds were placed upon freight cars in Railway Co. v. Armstrong, 62 Ill. App. 233. The rule was applied to the construction of a bridge in Illick v. Railroad Co., 67 Mich. 637, 35 N. W. 708.

The Supreme Court of Pennsylvania in the case of Boyd v. Harris, 176 Pa. 484, 35 Atl. 222, discussing an injury caused by a cattle chute placed in close proximity to a side track, says:

"This case presents a question, the importance of which extends far beyond the present parties, and the judgment to be entered herein. It is whether the location of the permanent structures along a line of railroad, necessary to accommodate its business, is to be determined by the railroad company or by a petit jury. If by the former, they may be located with reference to the convenient and economical use of the railroad, and the accommodation of its traffic. If by the latter, these considerations will be lost sight of, and the proper location will be a shifting one, to be settled by each successive jury in accordance with its own notions and the peculiar features of the case on trial. One jury may hold a given location to be safe and proper; the next jury may hold it to be unsafe, and therefore improper. There are many such structures necessary to the operation of a line of railroad. Among the more important of them may be mentioned the bridges, station houses, grain elevators, warehouses, water tanks, coal chutes, cattle chutes, signal stations, and tool houses. The position of these buildings with reference to the track of the railroad, their size, the mode of construction, must be determined with reference to their purpose, and their convenient use as a necessary part of the physical plant of the railroad company. Where they shall be placed, and how they shall be arranged, are questions that belong to the railroad company, as truly as the location of the switches and sidings, or of the track itself; and the discretion of its officers is no more under the control of a petit jury in the one case than in the other."

The holding of the courts in all these cases is that they are questions which belong to the railroad companies to decide, and cannot be submitted to a jury. It may then be assumed for the purposes of this hearing that the switch stand in question was part of an engineering scheme, and therefore, in the absence of those manifest errors in construction, which would be patent to an ordinary observer, did not involve a question of negligence to be passed upon by a jury.

There is nothing in the record, so far as it sets out the physical situation at the time of the accident, which would justify the court in finding, as a matter of law, that there was such an obvious and patent adjustment of the relative positions of the switch handle and the steps of the coaches running on the passenger lead as would charge either party to the suit with constructive knowledge of their dangerous relation to each other. The switch stand had been maintained eight years without accident. It lacked 1½ inches of standing in the middle of the 7 feet

9.inch space between the rip and passenger leads.   As said by the court in the case of Wood v. Louisville & Nashville Railroad Co. (C. C.) 88 Fed. 46:

"The fact that no accident of this kind had happened before upon the railroad, and that trains were constantly passing this chute without the development of this danger, brings it directly within the class of what we may call 'concealed dangers.' This danger was lurking for years without its being known. The constituent element of it was a matter of mere inches, and that, in the very nature of things, could not be detected by ordinary observation."

If, however, the location and maintenance of the two was an engineering question, it follows that plaintiff in error knew the exact position of the two with regard to each other.   The railroad company built, located, and maintained the switch stand.   It built and operated the passenger lead track.   It constructed the cars.   They were all, it insists, parts of its yard plant.   The whole situation was the result of a carefully devised plan, based upon scientific engineering principles applied to the needs of the railroad.   There is no claim here that anything was out of order, or that the accident was occasioned by any defect in the switch or passenger lead not embraced within the prearranged plans of construction and maintenance.   We are unable to see how plaintiff in error can escape the conclusion that it knew of the fact that the switch handle and car step would come into contact under certain conditions likely to arise.   Under the facts of this case, defendant in error had a right to assume that the railroad company would use due care in furnishing him a reasonably safe place in which to do his work.   This rule of law is well established.   In the case of Choctaw, Oklahoma & Gulf R. R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96, the court says:

"The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties."

The case of Texas & Pacific Railway Company v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188, is very emphatically in point.. The court says on page 672 of 170 U. S., page 779 of 18 Sup. Ct., 42 L. Ed. 1188:

"But no reason can be found for, and no authority exists supporting, the contention that an employé, either from his knowledge of the employer's methods of business or from a failure to use ordinary care to ascertain such methods, subjects himself to the risks of appliances being furnished which contain defects that might have been discovered by reasonable inspection.   The employer, on the one hand, may rely on the fact that his employé assumes the risks usually incident to the employment.   The employé, on the other, has the right to rest on the assumption that appliances furnished are free from defects discoverable by proper inspection, and is not submitted to the danger of using appliances containing such defects because of his knowledge of the general methods adopted by the employe. in carrying on his business, or because by ordinary care he might have known of the methods, and inferred therefrom that danger of unsafe appliances might arise.   The employé is not compelled to pass judgment on the employer's methods of business, or to conclude as to their adequacy. He has a right to assume that the employer will use reasonable care to make the appliances safe, and to deal with those furnished relying on this

fact, subject, of course, to the exception which we have already stated by which, where an appliance is furnished an employé in which there exists a defect known to him or plainly observable by him, he cannot recover for an injury caused by such defective appliance if, with the knowledge above stated, he negligently continues to use it. In assuming the risks of the particular service in which he engages, the employé may legally assume that the employer, by whatever rule he elects to conduct his business, will fulfill his legal duty by making reasonable efforts to furnish appliances reasonably safe for the purposes for which they are intended; and, while this does not justify an employé in using an appliance which he knows to be defective, or relieve him from observing patent defects therein, it obviously does not compel him to know or investigate the employer's methods of business, under the penalty, if he does not do so, of taking the risk of the employer's fault in furnishing him unsafe appliances. * * * 'Those [hazards] not obvious assumed by the employé are such perils as exist after the master has used due care and precaution to guard the former against danger. And the defective condition of structures or appliances which, by the exercise of reasonable care of the master, may be obviated, and from the consequences of which he is relieved from responsibility to the servant by reason of the latter's knowledge of the situation, is such as is apparent to his observation. Kain v. Smith, 89 N. Y. 375; McGovern v. Central Vermont Railroad, 123 N. Y. 280, 25 N. E. 373.' In Missouri Pac. Railway v. Lehmberg, 75 Tex. 61, 67, 12 S. W. 838, 840, the court considered a refusal to give a requested instruction, that if there were 'any patent defects in the engine or tank, and deceased knew, or might by ordinary diligence have known, of same, and said defects caused or contributed to the injuries complained of, the jury should find for the defendant.' The court said: 'Without now considering the question whether the rule in this respect charges an employé with knowledge of defects, except with regard to such appliances or instruments as he is engaged himself in using, we think it sufficient to say that the law does not, under any circumstances, exact of him the use of diligence in ascertaining such defects, but charges him with knowledge of such only as are open to his observation. Beyond that he has the right to presume, without inquiry or investigation, that his employer has discharged his duty of furnishing him with safe and proper instruments and appliances.' "

The evidence shows that defendant in error never was told of the danger that existed in throwing the switch, that he did not know of the same, and that the same was not open and obvious. The rule rule of law which requires a servant to exercise diligence and care to discover dangers does not apply here. "Upon this question," says the court in Choctaw, O. & G. R. R. Co. v. McDade, supra, "the true test is not in the exercise of care to discover danger, but whether the defect is known or plainly observable by the employé." It being clear that defendant in error did not know and was not chargeable with knowledge of the danger involved in working the switch, it follows that plaintiff in error was guilty of negligence in not advising defendant in error thereof, thus putting him upon notice. If this be true, then it is a matter of no consequence that the trial court may have overstated the duty of plaintiff in error toward defendant in error, or, indeed, as is insisted, that an engineering question may have been erroneously submitted to the jury. The duty of plaintiff in error towards defendant in error could be discharged only by the communication to defendant in error of its knowledge of the situation, and, upon its failure so to do, a legal conclusion of negligence on the part of the railroad company arises, which entitles defendant in error to recover for the injury unless the jury finds that he has been guilty of contributory negligence, or that the danger

was so open and obvious as to charge defendant in error with constructive knowledge. These matters were properly submitted to the jury by the court under proper instructions, and the finding of the jury upon them in favor of defendant in error is borne out by the evidence.

Further discussion of the other assignments of error raised by plaintiff in error is not necessary. No prejudicial error appearing upon the record, the judgment of the lower court is affirmed.