BORKOWSKI *v.* AMERICAN RADIATOR CO.

1. MASTER AND SERVANT — CONTRIBUTORY NEGLIGENCE — EXPLOSION OF MOLTEN METAL.

Plaintiff's alleged contributory negligence was a question for the jury where he placed a ladle for carrying molten metal, containing a small quantity of water, under the flowing metal, which exploded and blinded one of his eyes, and where he testified that he was ignorant of such danger.

2. SAME—DUTY TO WARN AND INSTRUCT.

The duty is imposed on the master to warn the servant of latent dangers which he, by reason of ignorance or inexperience, is incapable of understanding or appreciating, or which he would not be likely to know, such as the danger of an explosion resulting from the contact of molten metal with water.[1]

3. SAME—INSTRUCTIONS—CHARGES—ASSUMPTION OF RISK.

While language used in the court's charge, to the effect that it was not necessary to warn plaintiff of a danger which he must appreciate, was inaccurate, it was not misleading when considered with other portions of the charge, that if plaintiff's prior experience should have taught him the danger to be apprehended, no warning was required.

Error to Wayne; Hosmer, J. Submitted February 10, 1911. (Docket No. 156.) Decided March 31, 1911.

Case by Michael Borkowski against the American Radiator Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Keena, Lightner & Oxtoby*, for appellant.

*Dohany & Dohany*, for appellee.

---

[1]As to the duty to warn or instruct servant, see note in 44 L. R. A. 33.

As to the liability of master for injury to servant by explosion of molten metal with which he is at work, see note in 27 L. R. A. (N. S.) 953.

The plaintiff, a young man 21 years of age, started to work for defendant September 27, 1909, as a molder's helper. About two years earlier he had worked for defendant in the same shop and in the same capacity for a period of about 2½ months. It was his duty as a molder's helper to sift sand and shovel it into a box; also to carry molten iron in ladles provided for that purpose from the cupola to the molds. These ladles were of two sizes, the larger called "bull ladles," requiring two men to carry them, and the smaller, called "hand ladles," capable of being handled by one man. At the end of the day the molders would leave these ladles upon the floor of the foundry. It was the duty of one August Reinke to collect the ladles and wheel them out under a shed adjoining the foundry where, on the following morning, he would reline them with a mixture of fire clay and molding sand. After relining them they were placed in an oven until about 1 o'clock, when they were again ready for use. Plaintiff had been accustomed to use these ladles, particularly the bull ladles, while employed as a molder's helper.

On the morning of the second day of his last employment, September 28, 1909, plaintiff was put to work with the cupola gang. At the close of each day's work, a surplus of molten metal would remain in the large mixing ladle. It was the duty of the cupola gang to run this off into hand ladles and pour it into pig beds. About 5 o'clock the cupola gang were ordered to perform this duty. This was the first occasion upon which plaintiff had done this work, according to his own testimony.

Plaintiff described the accident as follows:

"After the molders got through, the foreman of the cupola told us to go over and get the smaller ladles, and carry the melted iron out of the big bull. We got the small ladles under the shanty.

"*Q.* And where did you go to get the small ladles?

"*A.* Under the shanty where all the rest of the men got it, and I got mine.

"*Q.* Now, did you go out of the west door of the small building to get into that shanty, or shed?

"*A.* I did.

"*Q.* State whether or not this establishment in which the coke is loaded on the small truck — state whether that is the shed.

"*A.* It is.

"*Q.* And will you state whether or not the south side of that shed is open from the roof down to the ground.

"*A.* It is.

"*Q.* And where did you pick up your ladle?

"*A.* I got mine about two feet south of the pile that the other fellows got theirs; there was a whole pile of them lying there, and they were all taking theirs, and I took mine about two feet south of the pile where they got theirs.

"*Q.* And were those ladles piled on top of each other, or were they just grouped together, standing on the ground?

"*A.* They were thrown on a pile.

"*Q.* Now, where did you get the handle to your ladle, the small ladle?

"*A.* There was a man brought it to me.

"*Q.* One of the helpers?

"*A.* Yes, sir.

"*Q.* State whether or not that was an iron handle.

"*A.* It was.

"*Q.* And that fitted around the ladle, around the top of it?

"*A.* It did. ·

"*Q.* Had you ever used one of these small ladles before?

"*A.* No.

"*Q.* How close to the open side of the shed was it that you picked up this ladle of yours?

"*A.* About three feet and a half.

"*Q.* You mean it was three and a half feet in under the edge of the shed, or three feet and a half out of the shed, which?

"*A.* Outside—three feet out of the shed.

"*Q.* Where was the other pile of ladles?

"*A.* They laid the same place.

"*Q.* That would make the pile of ladles—that is, where the ladles were grouped the thickest about under the edge of the shed, would it not?

"*A.* Yes; right on the edge.

"*Q.* Now will you state what you did with that ladle after you picked it up?

"*A.* I picked it up and went after the iron.

"*Q.* Will you state to the jury whether or not you helpers had to hurry, in order to get this metal out of the bull before it cooled?

"*A.* We had to, because it would get cold.

"*Q.* Who told you to?

"*A.* The foreman.

"*Q.* And did you start back with the other helpers as soon as you got your ladle?

"*A.* I did.

"*Q.* Do you know whether or not it rained on the afternoon of September 28th, the day you got hurt?

"*A.* It did.

"*Q.* Do you know about what time in the afternoon it rained?

"*A.* Between 3 and 4 o'clock.

"*Q.* Do you know whether or not there was in your ladle when you picked it up—water?

"*A.* There was a little water, I think.

"*Q.* About how much.

"*A.* About a spoonful.

"*Q.* Did you hurry right back with the other men to the bull after you got your ladle?

"*A.* I did.

"*Q.* Did you think it was dangerous for that water to be in the ladle?

"*A.* I did not; no one told me.

"*Q.* Were you the first one of the helpers to put your ladle under the bull to get it filled, or did some of the others fill their ladles first?

"*A.* There were some of the others who got it first.

"*Q.* What happened when this molten metal ran out of the bull into your ladle?

"*A.* When he turned it on, why the iron flashed right up.

"*Q.* When he turned what on?

"*A.* The man that turns on the metal.

"*Q.* Well, what do you mean, the man in charge of the wheel that turned the bull over?

"*A.* Yes, sir.

"*Q.* Well, when he turned the wheel, state whether or not some of the molten metal came out of the bull.

"*A.* It dropped into my ladle.

"*Q.* As soon as this molten metal from the bull struck into your ladle what happened?

"*A.* It came right up into the air.

"*Q.* What came up?

"*A.* The iron.

"*Q.* Did it make a noise?

"*A.* It made a kind of crack.

"*Q.* An explosion?

"*A.* Yes, sir.

"*Q.* Now did the metal strike you?

"*A.* It struck me right in the eye.

"*Q.* Did it strike you anywhere else?

"*A.* Some on my back.

"*Q.* Anywhere else?

"*A.* And on my shoulder.

"*Q.* And state whether or not it was hard when it struck you.

"*A.* No; it was melted metal.

"*Q.* And state whether or not the pieces were hard that struck you.

"*A.* No; they were not.

"*Q.* Well, do you know what sized piece struck you in the eye?

"*A.* Oh, it must have been about as big as a pea.

"*Q.* What did you do right afterwards?

"*A.* I caught hold of myself by the eye.

"*Q.* State whether or not any one connected with the company had ever told you to be careful about putting molten metal into a ladle that was wet, or had water in it?

"*A.* I did not.

"*Q.* Did any one else ever tell you that it was dangerous to put molten metal in that ladle — in a ladle with water or dampness in it?

"*A.* No one ever told me."

Upon cross-examination plaintiff testified that the ladle he secured was leaning against one of the posts which supported the roof of the shed. This shed was an open one.

The only negligence relied upon at the trial was that defendant had failed to warn plaintiff of the danger of allowing the molten iron to come into contact with water.

Plaintiff secured a judgment for $5,000, and defendant has removed the case to this court for review.

BROOKE, J. (*after stating the facts*). Defendant's first contention is that there is no liability, for the reason that plaintiff's injury resulted from a transitory act of negligence on the part of a fellow-servant; that act being the placing of the ladle which plaintiff secured in an improper place, where it was liable to collect and hold rain water. In our opinion this is not a case in which this doctrine can be invoked. The record shows that Reinke, in the performance of his duty, customarily collected the ladles and wheeled them out under this uninclosed shed, where they were piled or scattered somewhat promiscuously.

Reinke testified:

"As I bring these ladles out, I pile them up in different places around underneath that shed. The shed is wide open on the outside."

He further testified that he never put any ladles in the place from which plaintiff took the one which occasioned his injury. It would seem that an open shed would afford little protection to the ladles in case of rain. The record does not show that it was Reinke's duty to keep them dry after he had collected them and before he had relined them for use next day; nor does it show that he handled them on the day in question, in any other than the usual manner.

But the whole matter of alleged transitory negligence appears to us to be unimportant, because plaintiff does not predicate his right to recover upon the fact that defendant negligently permitted the ladle which caused his injury to be so placed as to collect water, but says that defendant was negligent only in not warning him of the fact that, if he permitted molten metal to come into contact with water, an explosion would follow. His testimony is to the effect that he was ignorant of this danger; that no such explosion had occurred within his observation during his employment as a molder's helper. It seems to us apparent that the ladles used by the molder's helpers would be very unlikely to contain moisture, for the record shows

that after relining they were baked in an oven and kept dry until required for use. The extent of plaintiff's experience and his opportunity for observation of like phenomena were fully placed before the jury. We do not think it can be said as a matter of law that his experience was such as to make him guilty of contributory negligence in placing the ladle containing a small amount of water under the flowing molten metal. Defendant insisted that it was such, and that question was fairly submitted to the jury.

It was further urged by the defendant that the accident occurred through the carelessness of plaintiff in so placing the ladle under the stream of metal as to permit it to fall, not into the ladle, but upon the cold, iron shank with which the ladle was held. This theory likewise was presented to the jury, and they were instructed that, if plaintiff received his injury because of this alleged act of negligence, he could not recover. We have frequently held that it is the master's duty to warn the servant of latent dangers, which he (the servant) through ignorance or inexperience was not capable of understanding or appreciating, or which he would not be likely to know; and the liability of an explosion following the mixing of molten metal and water has been held to be such a latent danger. *Smith* v. *Car Works*, 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542), and cases cited; *Ribich* v. *Smelting Co.*, 123 Mich. 401 (82 N. W. 279, 48 L. R. A. 649, 81 Am. St. Rep. 215); *Adams* v. *Refrigerator Co.*, 160 Mich. 590 (125 N. W. 724, 27 L. R. A. [N. S.] 953). See, also, *Tissue* v. *Railroad Co.*, 112 Pa. St. 91 (3 Atl. 667, 56 Am. Rep. 310); *McGowan* v. *Smelting Co.* (C. C.), 9 Fed. 861; *Holland* v. *Railroad Co.*, 91 Ala. 444 (8 South. 524, 12 L. R. A. 232).

Error is assigned upon that portion of the charge in which the court used the following language:

"Now, whether there was the duty upon the master in the particular case to give any such warning I think is wholly a question for you, under the existing circumstan-

ces, because, gentlemen of the jury, it is not essential to warn a man of danger which in the nature of things he must appreciate."

The use of the words 'must appreciate' in the foregoing excerpt is objected to. Standing alone, this portion of the charge might be misleading, but when read with the context it is apparent that the jury could not have been misled as to the standard of duty imposed upon the master.

The court later said:

"It is for you to say, gentlemen of the jury, whether that experience that he had, prior to that time, would have rendered it unnecessary that a person should warn him of the danger to be apprehended from bringing molten iron into contact with that amount of water. Of course, gentlemen of the jury, all the evidence in this case shows the extreme danger which results when a certain amount of hot iron is poured upon water, or hot iron is poured upon water; the proofs show that there is an instantaneous conversion of water into steam, and an explosion does follow, unquestionably; that all the evidence and the testimony shows; and it is for you to say whether his prior experience, concerning which you have heard the testimony of the plaintiff, and the testimony as adduced by the defendant, should have taught him of the danger to be apprehended by the water which he testifies was in the ladle. If, gentlemen of the jury, that experience should have warned him, then, of course, no warning which could be given him by the company would have been of any benefit."

A careful reading of the entire charge convinces us that the case was properly and fairly submitted to the jury, both upon the question of plaintiff's contributory negligence (based upon his experience) and upon the defendant's theory of the manner in which plaintiff received his injury. Under the facts disclosed by this record, both issues were properly before the jury.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, BLAIR, and STONE, JJ., concurred.