McCALMAN v. ILLINOIS CENT. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1914.)

No. 2452.

**1. Trial ($ 178*)—Verdict—Motion to Direct.**

On motion to direct a verdict, it is the duty of the trial judge to take that view of the evidence most favorable to the party against whom the direction is requested.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. § 178.*]

**2. Master and Servant ($ 150*)—Injuries to Servant—Perils—Warning.**

Where an occupation is hazardous, it is the master's duty to inform his servants of all perils to which they will be exposed, which are or should reasonably be known to him, except such as are obvious to the servants or through the exercise of ordinary care on their part may be foreseen and in either event injury therefrom be reasonably avoided.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 297, 299–302, 305–307; Dec. Dig. § 150.*]

**3. Master and Servant ($ 150*)—Injuries to Servant—Dangers—Duty to Warn.**

The duty of a master to warn his servants of perils to which they will be exposed extends to any change made by him which introduces into their service a new element of danger.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 297, 299–302, 305–307; Dec. Dig. § 150.*]

**4. Master and Servant ($ 151*)—Injuries to Servant—Duty to Warn—Delegation.**

A master's duty to warn of perils to which servants will be exposed is primary and nondelegable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 298; Dec. Dig. § 151.*]

**5. Master and Servant ($ 286*)—Injuries to Servant—Dangers—Duty to Warn—Question for Jury.**

In an action for injuries to a railroad guard, during a strike, in a collision with deputy marshals sent to a crossing where the guards were located in response to a telephone message that there was trouble at that point, through the marshals mistaking the guards for strikers, whether the railroad company was negligent in failing to warn the marshals of the presence of the guards, and the guards of the approach of the marshals, held for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Action by Charles E. McCalman against the Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

Caruthers Ewing, of Memphis, Tenn., for plaintiff in error.

A. W. Biggs, of Memphis, Tenn., for defendants in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SESSIONS, District Judge.

WARRINGTON, Circuit Judge. McCalman brought an action against the two railroad companies to recover damages for personal injuries suffered by him while in their employ and through their alleged joint negligence. A motion to direct a verdict in favor of the defendants was granted at the close of plaintiff's evidence, and the plaintiff brings error. The negligence alleged occurred under these circumstances: September 27, 1911, these two railroad companies filed a bill in the court below against the Brotherhood of Railway Clerks, Local Lodge No. 40, its officers in their individual capacities, and a large number of other persons who, it was averred, while in the employ of complainants, had left their posts of duty and entered upon a strike which greatly interfered with, if it did not stop, complainants' business at Memphis, and especially in its freight yards in and near that city. A restraining order was prayed for and granted, enjoining defendants from entering upon the complainants' premises and from committing various other acts. The strike was still in progress in and about some portions of the railroad property on the night of December 7, 1911, when McCalman was injured. A force of deputy marshals was maintained and used in carrying out the order of injunction, wherever disturbance arose in or around the railroad premises. Besides the deputy marshals, the railroad companies themselves employed and maintained a force of guards, among whom was McCalman, in what are known as the Nonconnah railroad yards, which are some four miles south of Memphis; and it was at an entrance to these yards, known as the Horn Lake road crossing, that McCalman received his injuries.

The negligent acts and omissions charged and relied on are that the railroad defendants brought into collision at the Horn Lake road crossing a number of deputy marshals and railway guards, including McCalman, without giving either body of men notice of the approach or presence of the other, under conditions and at a time when each set of men would naturally regard the other as hostile to the interests they were alike intending and under duty to protect. The declaration was met by pleas of not guilty and contributory negligence.

The deputy marshals were stationed in Memphis and the railroad guards in and about the Nonconnah yards. The Horn Lake road crossing was at the intersection of that road and the defendants' lead track near an entrance at the east end of the Nonconnah yards. Locomotives or switch engines, whether drawing cars or not, moving between Memphis and these yards, were required to pass this crossing, and also to stop or not according as the switch there maintained was closed or open; and this switch was quite as likely to be closed against the approaching engines as not. During the earlier part of the night in question a considerable amount of gunfiring was going on at the Nonconnah yards. Mr. Knight, who was in charge of the railroad guards, had himself fired some shots to frighten away a number of men he supposed were strikers, though he subsequently thought they were tramps. At a later hour of that evening, Knight and McCalman went to the yardmaster's office, which was within Nonconnah and 500 yards distant from the Horn Lake road crossing; and while there, Knight

and Leslie, the yardmaster, engaged in conversation as to the prospect of trouble during the night. Leslie feared an attack by strikers, complained that some of the guards had been cut off, and said that he was going to telephone to see if more guards could not be furnished. Knight declared that he with his guards could take care of the situation. Before any message was sent, Leslie arranged to have a switch engine take Knight and McCalman, with another guard, to the Horn Lake road crossing; Knight stating that he expected some men to pass there and that he intended to arrest them. Upon arriving at the crossing, it was found that some guards were already there. Knight remained for something like two hours, and then with two of the men went away. However, before leaving, Knight told the guards remaining, including McCalman, to stay there until midnight. Evidence was offered tending to show that at about 10 o'clock a telephonic message was received at the special agent department of the Illinois Central from the south yards in Memphis, stating "there was trouble in Nonconnah," and requesting the department "to send some men"; also, that Leslie telephoned from the Nonconnah yards to the south yards that "there was trouble down there and he wanted a guard—wanted him to send a deputy marshal." It resulted, though it is not clearly shown how it came about, that several deputy marshals were started from Memphis, on a switch engine, for the Nonconnah yards; the switch engine was equipped with a headlight and running board at each end; the crew, having one or two lanterns, rode on the running board at the end leading toward the yards, and the deputy marshals on the running board at the opposite end. Two structures were maintained by the railroad companies adjacent to the tracks leading to the Horn Lake road crossing—one was called "East Scales," and was within about 500 yards of that crossing; the other was called "Shanty A," and was within about 75 feet of the crossing; there was a telephone at each of these places. At the time the switch engine was approaching Horn Lake road crossing, a guard, a weigh-master, and a clerk were at East Scales, and a car inspector was at Shanty A. Just after the switch engine had passed East Scales, the weighmaster telephoned to this car inspector to "watch the rear end of the engine." As the engine was coming to a stop at Horn Lake road crossing, the car inspector called out from Shanty A to the guards: "Look out for that engine; there is some men on it without lights." This was not a customary occurrence. When the engine stopped, a deputy marshal left the footboard and ran toward the guards, saying in a "rough and threatening" manner, "What in the h—ll are you s—s of b—s doing here?" and at once began firing at the guards. This resulted in an exchange of some 25 or 30 shots between the deputy marshals and the guards. It is enough to say of the casualties that McCalman, who was not armed, was shot in such a place and manner as to be permanently and most seriously injured.

Now, while the evidence tends to show, as before pointed out, that Leslie had telephoned to Memphis that there was trouble at the Nonconnah yards, yet the evidence fails in express terms to show that the deputy marshals had been informed that a force of railroad

guards was stationed at the Horn Lake road crossing; though it affirmatively appears that these guards had not been notified that the marshals were coming. The district judge ruled that if it was the duty of the defendant companies to advise the marshals of the presence of the guards at this crossing, "the presumption would be that they were so advised, on the ground that they are presumed to have done their duty"; and that the failure to notify the guards of the message to the marshals was immaterial because the guards did nothing to bring on the conflict. Thus the questions arise: Were the conditions such as to place the defendants under any duty to McCalman so to notify the marshals, and, if so, was the record open to a presumption that defendants discharged the duty?

It must be conceded that plaintiff was engaged in a hazardous employment during the conditions usually attending such a strike as the one then prevailing at the Nonconnah yards; and yet it is now plain enough that a new and distinct peril was added to that employment, though whether this was due to any breach of duty on the part of defendants is the problem. No question is raised as to the authority of the corporate agencies, whose acts resulted in bringing these two sets of men to the place of injury. After the yardmaster had furnished the engine to carry the official (in charge of the guards) and two of the guards to the crossing, as stated, and, with the knowledge that guards were usually kept there, he knowingly caused the deputy marshals to come to the same place; true, the request was that they report at his office in the yards, but he knew that they would have to pass over the crossing and very probably stop there. Although the yardmaster accompanied his call for assistance from Memphis by a statement that "there was trouble in Nonconnah," he did not describe the nature of the trouble or limit it to any particular place either within or about the yards; and it must constantly be remembered that strike conditions then existed at these yards. Three engines had been torn up, and for quite a while "a state somewhat of riot and insurrection" had prevailed there.[1] What, then, would have been the natural impulse of the ordinarily prudent man, when arranging to bring these two bodies of armed men together—deputy marshals and railroad guards—at the crossing and at night? Would it have been to notify the marshals of the presence of guards at the crossing and the guards of the coming of the marshals? The means of telephoning and the yardmaster's knowledge were complete. It is not too much to. say that fair-minded men might honestly draw different conclusions in solving the question, whether these conditions were likely to create in each of these bodies of men a belief that its purpose was hostile to that of the other and so to add a new danger to the service of the guards. Tex. & Pac. Ry. Co. v. Harvey, 228 U. S. 319, 321, 33 Sup. Ct. 518, 57 L. Ed. 779. The duty of the com-

[1] Besides, the following statement appears in the brief of defendants' counsel: "It is conceded that there had been trouble in the Nonconnah yards; trains had been cut into, men had been intimidated in their work by shooting through the yards, and the night before, the office had been shot up by trespassers."

pany respecting notice is dependent upon a true answer to this question of fact; and, in case of affirmative answer, liability for failure to perform the duty is further dependent upon whether the omission was the proximate cause of the injury. It is vain for counsel to insist, as a matter of law merely, either that ordinary care and prudence would not have suggested the timely use of the knowledge and the means at hand to avert such beliefs, or that such use would not have avoided the mistake and its unfortunate consequences. Nor can it be laid down as matter of law that the weighmaster's telephoned message to the car inspector and the latter's call to the guards to look out for the men on the engine constituted an intervening cause of the conflict and one not to have been foreseen; for in such a situation of tense excitement it cannot be said that occurrences of this kind are not likely to happen, and thus to be anticipated.

[1, 2] It is true that this is an unusual case, and yet we do not see why it is not open to the application of familiar principles of law. In the first place, we have so often held as to render it unnecessary to repeat that upon a motion to direct a verdict it is the duty of the trial judge to "take that view of the evidence most favorable to the party against whom the direction is requested." [2] In the next place, it is a general rule as respects any hazardous occupation that the master shall inform his servants of all perils to which they will be exposed, which are or should reasonably be known to him, except such as are obvious to the servants or through the exercise of ordinary care on their part may be foreseen and in either event injury therefrom reasonably avoided. Mather v. Rillston, 156 U. S. 391, 399, 15 Sup. Ct. 464, 39 L. Ed. 464; Cincinnati, N. O. & T. P. Ry. Co. v. Gray, 101 Fed. 623, 627, 41 C. C. A. 535, 50 L. R. A. 47 (C. C. A. 6th Cir.); Mercantile Trust Co. v. Pittsburgh & W. R. Co., 115 Fed. 475, 480, 53 C. C. A. 207 (C. C. A. 3d Cir.); Chicago, M. & St. P. Ry. v. Riley, 145 Fed. 137, 142, 143, 76 C. C. A. 107, 7 Ann. Cas. 327 (C. C. A. 7th Cir.); American Mfg. Co. v. Zulskowski, 185 Fed. 42, 44, 107 C. C. A. 146 (C. C. A. 2d Cir.); Felton v. Girardy, 104 Fed. 127, 131, 44 C. C. A. 188 (C. C. A. 6th Cir.); Baxter v. Roberts, 44 Cal. 187, 192, 13 Am. Rep. 160; Borkowski v. American Radiator Co., 165 Mich. 266, 272, 130 N. W. 640; McGowan v. La Plata Mining & Smelting Co. (C. C.) 9 Fed. 861; 1 Shear. & Red. on Neg. (6th Ed.) § 203; 3 Labatt's Mas. & Ser. § 1146.

[3] This duty of the master so to inform his servants extends to any change made by him which introduces into their service a new element of danger. Cincinnati, N. O. & T. P. Ry. Co. v. Gray, supra, 101 Fed. at pages 627, 630, 41 C. C. A. 535, 50 L. R. A. 47; Sirois v. Henry, 73 N. H. 148, 151, 59 Atl. 936; Coll v. Westinghouse E. & Mfg. Co., 230 Pa. 86, 88, 79 Atl. 163; Ryan v. Chelsea Paper Mfg. Co., 69 Conn. 454, 459, 37 Atl. 1062; Knox v. American Rolling Mill, 236 Ill. 437, 443, 86 N. E. 90, 127 Am. St. Rep. 291; 3 Labatt's Mas. & Ser., § 1146, at p. 3043.

[2] It is but fair to the district judge to note that he recognized this rule, citing Williams v. Choctaw, O. & G. R. Co., 149 Fed. 104, 105, 79 C. C. A. 146 (C. C. A. 6th Cir.).

[4] And the duty so imposed upon the master is of a primary character and is therefore nondelegable. Mercantile Trust Co. v. Pittsburgh & W. Ry. Co., supra, 115 Fed. at page 481, 53 C. C. A. 207; Shear. & Red. on Neg. (6th Ed.) §§ 204, 205, 206. And see Sirois v. Henry, supra, 73 N. H. at page 151, 59 Atl. 936, and Bryson v. Gallo, 180 Fed. 70, 76, 103 C. C. A. 424 (C. C. A. 6th Cir.).

[5] Now, in applying these principles to the instant case, it is to be recalled that we are considering the question whether the defendants were, in view of the existing conditions, under any duty not only to notify McCalman of the message for and the coming of the deputy marshals, but also the marshals of the presence of the railroad guards at the Horn Lake road crossing. Apart from any duty to the marshals arising from the invitation to come to the yards, which we need not consider, the defendants bore a contractual relation to McCalman and so owed him the duty not to enhance the peril of his service. Plainly it would not have been sufficient merely to notify him of the coming of the deputies, though even this, as we have seen, was not done. The chief danger rationally to be apprehended lurked in the telephone message, "There was trouble at Nonconnah"; and the deputies approached the crossing with that belief. The nature of the danger, if under all the circumstances it was one reasonably to be anticipated, did not lessen defendants' duty to McCalman; for knowledge of these new conditions would have enabled him to decide whether to remain at the crossing or discontinue his service. In Baxter v. Roberts, supra, the former was employed by the latter to work upon his premises, and while removing a fence was fired upon from a neighboring lot and injured. When the employment was made, Roberts had reason to believe that interference with the fence would be forcibly resisted. After stating the "general principle which forbids the employer to expose the employé to unusual risk in the course of his employment and to conceal from him the fact of such danger," the court said (44 Cal. 193, 13 Am. Rep. 160):

"The nature or character of the agency or means through which the danger of injury to the employé is to be apprehended can make no difference in the rule, for the employé is entitled in all cases to such information upon the subject as the employer may possess, and this with a view to enable him to determine for himself if at the proffered compensation he be willing to assume the risk and incur the hazard of the business. * * *"

That decision, among others, was followed by the Court of Appeals of Colorado in Holshouser v. Denver Gas & Electric Co., 18 Colo. App. 431, 435, 72 Pac. 289, 291. There the company had been in trouble with strikers prior to plaintiff's employment, but it failed to notify him either of the strike or of certain threats of violence which the strikers had made concerning other persons who might take their positions; and the court rejected a distinction urged between that case and Baxter v. Roberts to the effect that in the latter case the employer was invading premises of another, while in the Holshouser Case the employer was conducting business upon its own premises, holding that:

"The degree of danger to be apprehended from exasperated men is not safely measurable by the cause of the exasperation."

In Lipscomb v. Railway & Express Co., 95 Tex. 5, 20, 64 S. W. 923, 926 (55 L. R. A. 869, 93 Am. St. Rep. 804), a building at one of the stations of the railroad company had been entered several times at night and goods stolen; and on the night in question the station agent placed two armed men in the building to catch the burglars. Lipscomb, a freight engineman, with his fireman, found it necessary, through disrepair of their engine, to leave it and the train and go to this station to report the condition and 'get orders. Finding the doors locked, they made a noise which awakened the guards, one of whom, mistaking Lipscomb for a burglar, fired at him and inflicted wounds from which he died. The action was for damages for negligent death. In the course of the opinion it was said:

"A distinct ground upon which it is claimed that the railroad company would be liable is that it owed to its servants the duty of giving to the guards such information and instruction as would protect the other servants against danger in going to the station, and also of giving to such other servants warning of the presence of such danger. This is a theory that should have been submitted to the jury, but the facts were not such as authorized the court to declare a liability as matter of law. Whether or not such instructions and warning were called for was a question for the jury and depended upon the further questions whether or not the presence of other employés and danger to them at the depot ought reasonably to have been foreseen by the company, and whether or not the omission of such precautions constituted negligence of which the shooting of Lipscomb was the proximate result."

We conclude, upon the whole, that the instant case should have been submitted to the jury under appropriate instructions, and, consequently, that it was error to grant the motion to direct. Any presumption that the defendants notified the deputy marshals of the presence of the guards at the road crossing was overcome by the clear tendency of the evidence. The telephonic message sent and received for the marshals fails to show any allusion to the railroad guards. The language of the deputy who opened the firing at the crossing was totally inconsistent with the idea that the marshals thought the men found there were railroad guards; and, moreover, it cannot be assumed that deputy marshals would have opened a murderous fire upon men they understood were there to aid them in suppressing trouble at the yards.

The question of variance need not be passed upon. If the objection had been urged below, no doubt the court would have allowed any amendment necessary to a correspondence between the allegations and proofs; and, besides, it does not appear that defendants were misled in this respect. Standard Oil Co. v. Brown, 218 U. S. 78, 84, 30 Sup. Ct. 669, 54 L. Ed. 939.

The judgment is reversed, with costs, and the cause remanded.